514 F.2d 279
 168 U.S.App.D.C. 383
 UNITED TELEVISION COMPANY, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee.
UNITED TELEVISION COMPANY OF EASTERN MARYLAND, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee, American
Broadcasting Company, Inc., Intervenor.
UNITED TELEVISION COMPANY OF EASTERN MARYLAND, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee.
UNITED TELEVISION COMPANY, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee.
 Nos. 73-1963, 73-1964, 74-1526 and 74-1527.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 18, 1974.
Decided Jan. 20, 1975.
Rehearing En Banc denied May 20, 1975.
 
 Robert J. Buenzle, Washington, D.C., with whom Vincent A. Pepper, Washington, D.C. was on the brief for appellants.
 Joseph Volpe, III, Counsel, Federal Communications Commission, with whom Ashton R. Hardy, Gen. Counsel, and Joseph A. Marino, Associate Gen. Counsel, Federal Communications Commission, were on the brief for appellee.
 John W. Pettit, Gen. Counsel, Federal Communications Commission, at the time the record was filed, also entered an appearance for appellee in Nos. 73-1963 & 73-1964.
 Philip V. Permut, Counsel, Federal Communications Commission, entered an appearance for appellee in No. 73-1964.
 James A. McKenna, Jr., and Edward P. Taptich, Washington, D.C., entered appearances for intervenor American Broadcasting Co., Inc., in No. 73-1964.
 Before MOORE,* Senior Circuit Judge for the Second Circuit, MacKINNON and ROBB, Circuit Judges.
 PER CURIAM:
 
 
 1
 These consolidated causes came on to be heard on petitions for review of the following orders of the Federal Communications Commission:
 
 
 2
 No. 73-1963 is the appeal of United Television Company, Inc. (United), licensed to operate WFAN-TV (Washington), from FCC Order 73-816, August 8, 1973, directing the station to resume darkened operations no later than December 1, 1973.
 
 
 3
 No. 73-1964 is the appeal of United Television Company of Eastern Maryland, Inc. (United-Maryland), licensed to operate WMET-TV (Baltimore), from FCC Order 73-817, August 8, 1973, incorporating by reference the findings of Order 73-816 with respect to this station and issuing the identical order to resume broadcasting.
 
 
 4
 No. 74-1526 is the appeal of United from FCC Order 74-386, April 26, 1974, revoking the station's license for failing to maintain regular broadcast scheduling and to comply with Order 73-816.
 
 
 5
 No. 74-1527 is the appeal of United-Maryland from FCC Order 74-387, incorporating by reference the findings of 74-386 and applying them to this station, and similarly revoking the station's license.
 
 
 6
 We conclude when the record is taken as a whole that the factual findings are supported by substantial evidence and the Commission's conclusions are free from reversible legal error. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We accordingly direct that the orders of the Federal Communications Commission sought to be reviewed in these proceedings are hereby affirmed.
 
 
 7
 Judgment accordingly.
 
 
 8
 Before BAZELON, Chief Judge and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.
 
 ORDER
 PER CURIAM:
 
 9
 Appellants' suggestion for rehearing en banc having been transmitted to the full Court and no Judge having requested a vote thereon, it is
 
 
 10
 Ordered by the Court en banc that appellants' aforesaid suggestion for rehearing en banc is denied.
 
 
 11
 Statement of BAZELON, Chief Judge, as to why he voted to deny rehearing en banc :
 
 
 12
 The FCC was faced here with a licensee (United) caught in an economic and technological bind. United's Washington outlet had a poor signal due to antiquidated operating specifications originally granted as a pioneer UHF facility. These shortcomings made it virtually impossible to compete with other stations in the area. Attempts by the licensee to improve and increase the signal were stymied by the Commission's duopoly provisions[1], since increasing the signal strength of the Washington station (WFAN-TV) would result in an overlap with the service area of another United-owned station (WMET-TV) in Baltimore. When United proposed to sell WMET-TV in order to permit upgrading of WFAN-TV, the Commission refused to allow the transfer until other ongoing proceedings into United's character qualifications were concluded.[2] The fear underlying this refusal, that permission to sell would allow the licensee to evade possible future sanctions, seems unfounded as United itself admitted that it would remain under the regulatory jurisdiction of the Commission as the owner of various other licenses.[3]
 
 
 13
 Faced with this denial and continuing financial losses, United applied for and received permission from the Commission to suspend broadcast operations pending the outcome of the other proceedings. A year and a half later, the FCC rescinded this permission and ordered United to resume broadcasting on WFAN-TV and WMET-TV at their original signal strengths until all review and appeals of the various proceedings were concluded.[4] United was thus presented with the following problem: It could not sell the Baltimore station or improve the Washington station without FCC approval, yet it could not resume operation of either outlet financially at the original broadcasting specifications. Caught between Scylla and Charybdis, United decided not to resume telecasting; soon after, the licenses for both stations were revoked.[5]
 
 
 14
 The decision of the Commission to revoke the two licenses in addition to the previous refusals of United's requests, appear to run counter to two affirmative policies of the agency. First, the Commission found that WFAN-TV provided "meritorious programming service", particularly for the Black community in Washington.[6] The programs were also produced and presented in large part by minority staff. The Commission has long recognized that the ascertainment of community needs and problems is a primary responsibility of a licensee,[7] and has stressed the importance of minority employment in broadcasting,[8] yet here it seems to have taken little notice of United's accomplishments or of the impact on the Black community of this license revocation.
 
 
 15
 Second, the Commission has adopted a policy since 1962 of encouraging the greater use of UHF facilities and has implemented various proposals to make the "high-band" stations more competitive with the more established VHF channels.9 Here United sought to upgrade its signal and services in order to compete with an entrenched VHF market. The Commission's actions in denying the proposal to sell WMET-TV so that WFAN-TV could be improved and the subsequent revocation of both licenses can hardly be seen as encouragement in the use of UHF.
 
 
 16
 The Commission appears to be of the view that some signal is better than no signal at all.[10] The FCC, however, ignores the economic realities of producing a poor signal in a major market and then insures by its own actions that there will be no signal.
 
 
 17
 Apart from these policy considerations, it seems that the Commission was hardly impressed with our decision in Channel 16 of Rhode Island v. FCC,[11] a case that is similar on its facts. There we reversed a revocation and directed the FCC upon remand to consider, in light of unusual circumstances, a modification of its previous strict application of rules. The Commission has attempted to distinguish Channel 16 on its facts in three ways: (1) Channel 16 dealt with a grant of extension of time for a construction permit, whereas United's construction had already been completed. This distinction seems insignificant, especially in view of United's poor quality signal, and its repeated application for construction to improve this signal. (2) The delay in channel 16 was caused exclusively by the FCC in its inquiry into CATV operations; the delay in United was due to the licensee's own requests during the evidentiary hearing. While it should be noted that United is far from blameless in causing procedural delay, they should not be penalized solely for exercising due process rights.[12] (3) In the Channel 16 viewing area, there was no absence of other available channels, but there was such an absence in the Washington area. This reasoning suggests that United's blackingout deprived other potential broadcasters of an available channel, while no such deprivation occurred in Rhode Island. However, if we look to the possible harm caused the public, rather than potential broadcasters, it would seem that less damage occurs when one out of many local stations goes off the air than when the only local station (Channel 16) blacks out.[13] I wonder if these distinctions either miss or ignore the basic thrust of the Channel 16 decision that the Commission should use its powers of equitable discretion to adapt its policies to fit the needs of special circumstances.[14]
 
 
 18
 Instead of reaching a solution that would serve both the licensee and the public interest, the agency's inflexibility has left the realities of the situation even more complicated. The effect of the present decision is that in place of two full-capacity UHF stations in the Washington-Baltimore area with two owners, we now have neither station operating pending new applications for both, a lengthy, unnecessary process.
 
 
 19
 Fortunately, however, the injustice wrought by the FCC's mechanical decision will be ameliorated ultimately. For if the character hearings are resolved in United's favor, it may reapply for its Washington license. If successful, United would have had de facto permission to suspend operations with the right to resume broadcasting upon the completion of the character proceedings. Presumably, United would not receive a demerit in a later application because of the blackout and revocation; if it did, judicial review would be available.
 
 
 20
 Since United's situation may well be rectified and since this case does not present an important question of law, I do not think the extraordinary procedure of rehearing in banc is warranted.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d)
 
 
 [1]
 United Television Co., 18 F.C.C.2d 363, 373 (1969)
 
 
 [2]
 United Television Co., 38 F.C.C.2d 400 (1972). See Jefferson Radio Co. v. FCC, 119 U.S.App.D.C. 256, 340 F.2d 781 (1964). See also LaRose v. FCC, 161 U.S.App.D.C. 226, 494 F.2d 1145 (1974)
 
 
 [3]
 The Commission denied United permission to sell any station because if the licenses were not renewed following the character hearings, United would have nothing to assign, United Television Co., 38 F.C.C.2d 400 (1972). However, any potential buyer would be forewarned of the "cloud" on the license and United has already stipulated that it would sell its station at no profit. If the FCC is fearful least United be unjustly enriched should the renewal fail, it might consider a less drastic alternative, e. g., to require that any proceeds from a sale of the license be placed into an escrow account pending final resolution
 
 
 [4]
 United Television Co., 42 F.C.C.2d 390 (1973)
 
 
 [5]
 United Television Co., 46 F.C.C.2d 698, 701 (1974)
 
 
 [6]
 United Television Co., 26 P&F Radio Reg.2d 1315, 1402, 1404 (1973)
 
 
 [7]
 See, e. g., City of Camden, 18 F.C.C.2d 412 (1969)
 
 
 [8]
 See TV 9, Inc., 161 U.S.App.D.C. 349, 495 F.2d 929, 935-38 (1973), cert. denied, 419 U.S.986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974); Non-Discrimination in Broadcast Employment, 18 F.C.C.2d 240 (1967). See also King's Garden, Inc. v. FCC, 162 U.S.App.D.C. 100, 498 F.2d 51 (1974)
 
 
 [9]
 See Fostering Expanded Use of UHF Television Channels, 45 F.C.C. 144 (1962)
 
 
 [10]
 Supp. Brief for Appellees at 12-15
 
 
 [11]
 142 U.S.App.D.C. 238, 440 F.2d 266 (1971)
 
 
 [12]
 Cf. Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1962)
 
 
 [13]
 Cf. Associated Press v. United States, 326 U.S. 1, 20, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945)
 
 
 [14]
 As of the Court in Channel 16 said:
 When there is such a showing (of special circumstances) the agency must consider whether its general policy should be waived, or better, perhaps should be altered with a general albeit partial modification. . . . There is no discussion whatever by the FCC of the policy considerations beyond a wooden recital of its 'beyond control' litany. There are other instances . . . in which the kind of policy considerations relied upon by Channel 16 were held to warrant equitable consideration. In these circumstances the FCC's rigidity unaccompanied by meaningful consideration of the particular of partial problems contemplated by its own safety valve regulation, cannot be sustained as consistent with the Rule of Law.
 440 F.2d at 276.